STATE EX REL. RICHMOND v. DISTRICT COURT OF
SECOND JUDICIAL DISTRICT WITHIN AND
FOR ALBANY COUNTY, ET AL.

(No. 1787; September 27, 1932; 14 Pac. (2d) 673)

The cause was submitted by the plaintiff on the brief of *Corthell, McCollough and Corthell,* of Laramie, Wyoming.

The case was submitted by defendants on the brief of *J. A. Greenwood,* Attorney, General; *Richard J. Jackson,* Deputy Attorney General; *George W. Ferguson,* Assistant Attorney General, and *R. Dwight Wallace,* all of Cheyenne, Wyoming.

RINER, Justice.

This is an original proceeding commenced in this court by the plaintiff, seeking the issuance of a writ of prohibition commanding the District Court of the Second Judicial District of Wyoming, within and for the County of Albany, and V. J. Tidball, Judge thereof, to refrain from granting an order authorizing and directing John A. Reed, State Examiner, in charge of liquidation of First State Bank of Laramie, an insolvent corporation, to apply for, and said Examiner to desist from further steps to procure, a loan in the sum of not to exceed $150,000 from the Reconstruction Finance Corporation, the funds derived from

such loan to be distributed to depositors and creditors of the insolvent bank. Upon presentation of the petition, an alternative writ was issued and the defendants filed their answer to which plaintiff has demurred on the ground that it was insufficient in law on its face to constitute a defense in favor of the defendants, as against plaintiff's petition. Upon the issues thus raised, the cause has been submitted for determination.

The allegations of plaintiff's petition, summarized, are to the following effect: After stating generally that the defendants are proceeding and are about to proceed in excess of their lawful jurisdiction in the matter hereinafter more particularly described and, after setting out in paragraph number "I" the official character of the personal defendants and that the First State Bank of Laramie is and was, during the times mentioned in the petition, a Wyoming corporation engaged in the business of banking, it is alleged in paragraph "II" that the State Examiner, on account of the insolvency of the bank, on April 27, 1932, took possession of its property and business and now retains them for the purpose of legal liquidation. In paragraph "III", the plaintiff is averred to be not only a shareholder in the bank who has discharged all his obligations as such, but also a creditor thereof through being one of its depositors whose claim has been allowed, but upon which nothing as yet has been paid.

The pleading then relates in its paragraph numbered "IV" that on or about June 27, 1932, the defendant Reed, as liquidating agent of the bank aforesaid, filed his petition in the District Court above named praying for an order authorizing him to apply to and contract with the Reconstruction Finance Corporation for a loan of $150,000 or so much of that amount as may thus be obtained, to give his promissory note therefor, and to pledge any

and all assets of the bank to secure the same, to the extent of $225,000, in accordance with the regulations adopted by the said Reconstruction Finance Corporation, a true copy of said petition of the liquidating agent being attached to and made a part of plaintiff's pleading.

Paragraph number "V" avers that the said District Court on or about June 30, 1932, heard the Examiner's petition aforesaid with the result that the judge thereof announced that the order as prayed for would be signed when prepared and upon his return to the Second Judicial District from which he was for the time obliged to be absent, this allegation being followed by the statement that the order has been prepared and will be signed and the aforesaid loan applied for and negotiated unless a writ of prohibition shall issue from this court.

In paragraph "VI" is set forth the organization of the Reconstruction Finance Corporation as a corporate body created under Congressional Act (15 U. S. C. A. §§ 601-617), for the purpose, among others, of aiding banking institutions now in the process of liquidation, by making loans to them upon the promissory notes of the liquidating agents of the banks, secured by a pledge of the assets of such institutions, in accordance with rules which the corporation, under said Act may adopt, certain enabling provisions of Section 5 of the Act being thereupon recited, among which are these:

"Sec. 5. To aid in financing agriculture, commerce, and industry, * * * the corporation is authorized and empowered to make loans, upon such terms and conditions not inconsistent with this Act as it may determine, to any bank, * * * organized under the laws of any State or of the United States, including loans secured by the assets of any bank that is closed, or in process of liquidation to aid in the reorganization or liquidation of such banks, upon application of the receiver or liquidating agent of such bank and any receiver of any national bank is hereby authorized to contract for such loans and to

pledge any assets of the bank for securing the same; Provided, That not more than $200,000,000 shall be used for the relief of banks that are closed or in the process of liquidation.

"All loans made under the foregoing provisions shall be fully and adequately secured. The corporation, under such conditions as it shall prescribe, may take over or provide for the administration and liquidation of any collateral accepted by it as security for such loans. Such loans may be made directly upon promissory notes or by way of discount or rediscount of obligations tendered for the purpose, or otherwise in such form and in such amount and at such interest or discount rates as the corporation may approve　＊　＊　＊

"Each such loan may be made for a period not exceeding three years, and the corporation may from time to time extend the time of payment of any such loan, through renewal, substitution of new obligations, or otherwise, but the time for such payment shall not be extended beyond five years from the date upon which such loan was made originally."

On information and belief, paragraph "VII" states that the directors of the Reconstruction Finance Corporation have ruled that no loan will be made to any bank in process of liquidation unless the loan be secured by pledge of at least one-third of the bank's assets and that to secure any loan from said Corporation, it will be necessary for the liquidating agent to pledge the assets of the First State Bank of Laramie in an amount exceeding fifty per cent in excess of the amount borrowed, as collateral security therefor.

Paragraph "VIII" details, also on information and belief, the several acts which the liquidating agent, without lawful authority, intends to do in order to obtain the loan from the Reconstruction Finance Corporation, as recited in said agent's petition and which, it is alleged, he will do unless prohibited by the order of this court. The charge is made in paragraph "IX" that if the loan and pledge of assets as security therefor is effectuated as pur-

posed by the defendant State Examiner, the liabilities of the insolvent bank will be increased and the assets thereof imperiled, dissipated, and lost, to the plaintiff's special loss and injury, the source from which he might or will be able to receive funds in repayment of his deposits being rendered subject to foreclosure and loss.

In paragraph "X" it is averred that Section 10-512 of Article V, Wyo. Rev. St. 1931, provides:

"Upon taking possession of the property and business of such bank, the State Examiner is authorized to collect money due to such bank and do such other acts as are necessary to preserve its assets and business and shall proceed to liquidate the affairs thereof, as hereinafter provided. The State Examiner shall collect all debts due and claims belonging to it and, upon the order of the District Court in and for the judicial district in which the office of such bank was located, may sell or compound all bad or doubtful debts, and, on like order, may sell all the real estate and personal property of such bank, on such terms as the court shall direct; and the State Examiner, upon the terms of sale or compromise directed by the court, shall execute and deliver to the purchaser of such real or personal property such deeds or instruments as shall be necessary to evidence the passing of the title";

It is then alleged that, other than as granted in said section, the district courts of the state have no jurisdiction over the assets and business of an insolvent state bank or over the State Examiner as agent in charge of the liquidation thereof and, other than as is in said section set forth, the State Examiner has no power or jurisdiction over said assets and business. Paragraph "XI" charges that plaintiff has protested to the State Examiner against his intended course of action to effectuate the loan as aforesaid and to the said District Court against the making and entering of such an order as will purport to grant the authority sought by the Examiner, but all to no avail. The prayer of the petition is for the issuance of an alterna-

tive writ of prohibition and that, upon final hearing, the writ be made absolute, "restraining said court and judge thereof and said John A. Reed, State Examiner, in charge of the liquidation of said First State Bank of Laramie from proceeding in said action, and from taking any further action or proceeding, or proceedings, whatsoever, in the matter of said loan, as aforesaid."

The application of the State Examiner made to the District Court of Albany County and made a part of paragraph "IV" of plaintiff's petition, as related above, alleges in substance as follows: That on April 27, 1932, John A. Reed, as State Examiner, upon the resolution of the Board of Directors of the First State Bank of Laramie aforesaid, took possession of the bank's property and business; that on January 22, 1932, Congress passed the Act under which the Reconstruction Finance Corporation was organized, whose powers and authority are thereupon pleaded in similar form as appears in paragraph "VI" of the petition of the plaintiff herein; that the suggested form of agreement required by said Reconstruction Finance Corporation to be executed by a liquidating agent of a state bank, in order to obtain a loan under said Act, is attached and expressly made a part of the application as is also a schedule of the commercial and savings loans of said bank, such assets totaling $763,906.84 in face value; that in applicant's opinion, it is to the best interest of the bank's depositors and creditors that he obtain a loan of $150,000 or so much thereof as it may be possible to secure, to be immediately distributed to said depositors and creditors and that he be authorized to contract for such loan as provided in the aforesaid form of agreement and to pledge, discount or rediscount or otherwise deal in any or all of the assets of the bank to the extent of $225,-000 as security for a loan of $150,000 and, if a less amount be loaned by the Reconstruction Finance Corporation, then a proportionately less amount of the assets of the

bank be authorized to be pledged as security therefor; that the exact total amount of security necessary to secure said loan cannot be told until negotiations are had with the Reconstruction Finance Corporation, but that the maximum amount of securities to be pledged or otherwise dealt in will total not more than $225,000, if a loan of $150,000 be granted and will be proportionately less as the loan amount is reduced below the sum last mentioned; that in applicant's opinion a selected list of the bank's assets in the amount of $225,000 would not, under present economic conditions, sell for the sum of $150,000, but at a much less sum, while the face value of said assets would be realized if their liquidation were deferred by a loan as aforesaid so that said assets could be disposed of under normal economic conditions and thus be of great benefit to the depositors and creditors of the bank and the community where it is situated; that a forced liquidation under present economic conditions, which will be necessary to wind up the bank's affairs if the loan is not obtained, will work a material detriment to said community and result in great loss to said depositors and creditors. The prayer of the application is that an order be made authorizing and directing the Examiner to apply for a loan from the Reconstruction Finance Corporation, to contract for such loan and to pledge any and all assets of said bank to secure the same, to the extent of $225,000, as security for a loan of $150,000 or so large a portion thereof as can possibly be obtained.

In the suggested form of agreement attached and made a part of the application as stated in the preceding paragraph, among others appear the following provisions:

"4. The applicant hereby applies to the Corporation for a loan in the above amount, the proceeds thereof to be used to aid in the liquidation of the receivership estate, and hereby grants to the Corporation a first lien upon the assets of the receivership estate listed in the statement attached hereto (Exhibit C) and agrees to deliver such

assets to the Corporation as pledgee (or to its designated custodian) upon approval of this application, unless otherwise instructed by the Corporation. The applicant agrees to proceed diligently with the liquidation of the pledged assets subject to the lien of the Corporation, and to pay the proceeds thereof to the Corporation as received. Such assets may be released to the applicant upon trust receipt, under arrangements satisfactory to the Corporation.

"5. In order to insure faithful accounting by the applicant for all such pledged assets and the proceeds thereof, the applicant will give a bond, in form and amount satisfactory to the Corporation, executed by ............................ Company as Surety, or such other qualified surety company as the Corporation shall approve.

"8. The applicant will pay, or cause to be paid, promptly when due, all taxes, insurance premiums and other charges or expenses necessary for the enforcement, preservation and/or protection of any security pledged hereunder, including fees for filing and recording mortgages and the like, or assignments thereof required by the Corporation. If the applicant fails to make any such payments, the Corporation is authorized to make such payments in the name of the applicant and shall have a first lien upon all collateral held by it until it shall have been fully reimbursed for any payments so made, together with interest thereon at the rate of 6% per annum.

"9. Upon default in the payment of any indebtedness to the Corporation incurred hereunder, or upon default in the performance of any other agreement on the part of the applicant, and such default shall continue for ten days after written notice by the Corporation to the applicant specifying such default and requiring the same to be remedied, the Corporation may collect, and at the expense and in the name of the applicant, or otherwise, enforce the payment when due of any or all collateral security held hereunder, by suit, or otherwise, and may release, renew, extend or exchange all or any part thereof, and may apply the net proceeds thereof to the payment of this loan.

"10. The applicant agrees that no distribution or dividend shall be made out of any of the assets of the receivership estate except out of the proceeds of this loan until such loan is repaid and that such assets of the receivership estate shall be and remain bound for the payment of all indebtedness incurred hereunder.

"In the event that a loan is made hereunder, this application and agreement shall be and become a contract between the applicant, as receiver, and the Corporation which shall be binding upon and inure to the benefit of the successors and assigns of the Corporation and shall be binding upon and inure to the benefit of the successors in office and assigns of the applicant."

Wherever the word "Corporation" is used in the foregoing quoted provisions of the proposed application, it will be understood as referring to the Reconstruction Finance Corporation.

The answer of the defendants admits the allegations contained in paragraphs I, II, III, IV, VI, and XI of plaintiff's petition. Admitting all the allegations of paragraph "V" of said petition, it is additionally averred in substance that, after a full hearing at which the testimony of witnesses was taken, the District Court of Albany County reached its determination upon the merits of said application and that its order will provide that the assets authorized to be pledged shall not exceed one and one-half times the amount of any loan made by the Reconstruction Finance Corporation, a certified transcript of the testimony thus taken being attached to the answer and "by reference" made a part thereof.

Answering paragraph "VII" of the petition, it is denied that the Reconstruction Finance Corporation has any established rule with reference to the amount of security required for any loan, it being alleged that the amount of security required is determined by an investigation conducted by the said Corporation relative to each particular application. Denying that defendants intend to pledge the bank's assets as collateral security in an amount exceeding fifty per cent in excess of the amount borrowed, it is stated that the assets pledged as collateral will not exceed one and one-half times the amount borrowed.

The answer denies the allegations of paragraph "VIII" but avers in general that the Examiner will present an order to said District Court and the judge thereof authorizing and directing the loan as prayed for; that said Examiner will apply to the Reconstruction Finance Corporation for such a loan and will execute and deliver to the said Corporation the note or other evidence of indebtedness of the bank and of himself as liquidating agent in the amount for which the application may be approved, which said note or other evidence of indebtedness will bear interest and contain such terms and conditions as may be required by said Corporation, subject to the terms of the order of said District Court; that the examiner, as liquidating agent, will pledge or otherwise encumber in such form as may be prescribed by said Reconstruction Finance Corporation, subject to the provisions of said court order, in an amount not to exceed one and one-half times the amount of the obligation for which the assets are to be pledged, such part of the bank's assets as may be required by the said Corporation for the payment of the obligation to be executed as aforesaid by the Examiner, who intends to and will do these things unless prohibited from so doing by the order of this court.

Answering paragraph "IX" of said petition, the defendants deny its allegations, averring generally that the proposed loan will materially aid the bank, its depositors, and creditors, as well as agriculture, commerce, and industry in the bank's community; that in the bank's assets are securities which will, in the opinion of the Examiner, in the course of time work out and preserve an equity for the maker in a great many cases, but that a forced liquidation of the collateral at the present time will prejudicially affect agriculture, commerce, and industry in the community where the bank is located; that if such a loan is not obtained, it will be "necessary to liquidate the assets of the First State Bank as rapidly as possible."

Paragraph "X" of the petition is answered by admitting that Section 10-512 of Wyo. Rev. St. is in part as quoted therein, it being denied, however, that said section is the "sole source of authority and/or jurisdiction over insolvent banking corporations in this state." It is prayed that the alternative writ be dissolved and the cause dismissed at plaintiff's cost.

The certified transcript of testimony attached to defendants' answer discloses that, except as to formal matters related to taking over the assets of the First State Bank of Laramie, the State Examiner was the only witness who testified on the hearing, his statements as to the merits of his application for leave to apply for the loan aforesaid being largely expressions of opinion in line with the allegations of that pleading as summarized above. In the course of his testimony appears the following:

"Q Do you know the exact amount of security that is required by the Reconstruction Finance Corporation?

"A I don't know. I don't think they have any established rule. This (proposed) basis is arrived at from our statute governing in cases of going institutions, banking institutions. That statute provides that a bank may borrow upon its bills payable a sum not exceeding its capital and surplus, and that it may be secured by collateral of the bank to the extent of one and one-half times the amount borrowed. * * *

"Q If a loan is secured from the Reconstruction Finance Corporation, or if for any other reason you can defer the liquidation of these assets, what is your opinion as to the recovery of the face value of these assets?

"A That would depend, of course, entirely upon conditions. We naturally assume that conditions could not be any worse than they are now. But if we are in position to defer this liquidation, the creditors will be benefited thereby, I believe, and I also believe that the assets pledged should liquidate much greater in the future.

"Q And that opinion is based, of course, upon the assumed return of normal economic conditions at a future time?

"A It is.

"Q   And if a loan of some kind is not secured, and if you are unable to borrow money from the Reconstruction Finance Corporation, or are unable to defer liquidation in some other manner, under present economic conditions, what would be your opinion as to whether or not that would be beneficial or detrimental to the community, and whether or not it would result in a loss to the depositors and creditors of the First State Bank of Laramie?

"A   It is my opinion that the loss to the creditors of the First State Bank would be much greater if liquidation was forcibly carried on during the present conditions than it would be if they are able to be carried on through a period of months or years.   *   *   *

"Q   If you do not obtain a loan of some kind, you will be forced to liquidate in that manner?

"A   We will be forced to liquidate in that manner just as rapidly as we can, because we cannot afford as liquidating agent to advance expenses and so forth necessary to carry on the operations. It becomes a matter of speculation when the liquidating agent is obliged to advance expenses for carrying on a business, when conditions may or may not improve."

The office of the writ of prohibition when issued out of this court is as stated in State ex rel. Mau v. Ausherman, 11 Wyo. 410, 72 Pac. 200, 204, 73 Pac. 548.

"the prevention of the exercise by an inferior court of a jurisdiction with which it has not been vested by law; and the writ issues in such case only when the party seeking it is without other adequate means of redress for the wrong about to be inflicted. It is granted to prevent action, and not to undo what has already been done."

The State Examiner, an administrative officer of the state, appointed by the Governor, obviously not being an "inferior court," his action cannot, as prayed in plaintiff's petition, be controlled through such a writ. State v. True, 26 Wyo. 314, 184 Pac. 229.

The question to be determined, then, is whether the District Court of Albany County is acting within its lawful

jurisdiction in undertaking to authorize the State Examiner to apply for and obtain, under the circumstances and terms detailed in the pleadings hereinbefore reviewed which may be taken as established for the purposes of the demurrer interposed, such a loan from the Reconstruction Finance Corporation as his application describes. In arriving at a proper solution of this question, it obviously becomes necessary to consider the powers granted by law to the court and to the State Examiner, as well as their relations to each other, touching the affairs of an insolvent state banking institution.

The claim is made for the defendants that the jurisdiction of the District Court to act as requested by the Examiner may be upheld upon two grounds, viz.: "Under the general authority and discretion granted to the State Examiner in the language of Section 10-512, Wyo. Rev. St. 1931," heretofore recited as set out in paragraph "X" of plaintiff's petition and reading, "Upon taking possession of the property and business of such bank, the State Examiner is authorized to collect money due to such bank and do such other acts as are necessary to preserve its assets and business and shall proceed to liquidate the affairs thereof, as hereinafter provided," and also, "because the liquidating agent takes the place of a receiver and the court of equity has long exercised full control over receiverships."

Previous to the year 1925, when a bank organized under the laws of this state became insolvent, the Attorney General was required to file in the District Court having jurisdiction of the matter "a proper bill in equity or petition" upon which the court was authorized to "appoint a receiver to take charge of all its property" and to "proceed at once, through its receiver appointed in accordance with law, to dispose of all its property" and, after paying accrued costs and the liabilities of the bank in full or pro rata as possible, any remaining balance was in due

course to be divided among the stockholders of the defunct institution. This was the procedure required by the provisions of Chapter 326, Wyo. Comp. St. 1920.

The eighteenth state legislature, by an act, approved February 27, 1925 (Ch. 157, Laws Wyo. 1925) and known as the "Banking Act," not only specifically repealed Chapter 326 aforesaid, but positively declared (Sec. 99 of Ch. 157 aforesaid) that:

"No receiver shall be appointed by any court, nor shall any deed of assignment for the benefit of creditors be filed in any probate court or court of insolvency, within this state, for any bank doing business under the laws of this state, except upon notice to the State Examiner, unless in case of urgent necessity it becomes in the judgment of the court necessary so to do in order to preserve the assets of such bank. The State Examiner may within five days after the service of such notice upon him, take possession of such bank, in which case no further proceedings shall be had upon such application for the appointment of receiver or under such deed of assignment, or, if a receiver has been appointed or such assignee shall have entered upon the administration of his trust, such appointment shall be vacated or such assignee shall be removed upon application of the State Examiner to the proper court therefor, and the State Examiner shall proceed in all such cases to administer the assets of such bank as herein provided."

This act undertook to define the powers and duties of the State Examiner in handling the affairs of insolvent banks, through Section 91. This last mentioned section and the statutory provisions last above quoted were each carried forward into the Wyoming Revised Statutes of 1931, the former as Section 10-512 and the latter as Section 10-520. These sections especially, as well as other provisions of Article 5 of Chapter 10 of the Wyoming Revised Statutes of 1931 (Rev. St. 1931, Sec. 10-501 et seq.), dealing with the insolvency and liquidation of failed state banking institutions, make it very clear that it was the purpose of

the legislature to establish a new and exclusive method of administering the affairs of insolvent banks through an administrative state officer — the State Examiner — with which method the courts should have nothing to do except in certain specified instances. A number of states of the Union appear to have adopted statutes of similar purport.

The scheme of designating an executive officer to take over the assets and liquidate the affairs of insolvent financial institutions would seem fairly traceable to the National banking laws of the country. Similarity with our state law exists not only in the method used to accomplish the liquidation of failed national banks, but also in some of the statutory language employed in defining the duties and powers of the liquidating officer. Thus, we find the Federal law providing (§ 1, 19 Stat. 63, U. S. C. A. 12; § 191):

"Whenever the comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver who shall proceed to close up such association, and enforce the personal liability of the shareholders, as provided in Section 192."

And Section 192 reads in part (R. S. § 5234; May 15, 1916, c. 121, 39 Stat. 121; 12 U. S. C. A., § 192):

"Such receiver, under the direction of the comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct;"

Discussing the position occupied by such a "receiver" as regards the Federal courts, the Supreme Court of the

48

United States, in Ex parte Chetwood, 165 U. S. 443, 445, 17 S. Ct. 385, 41 L. Ed. 782, has said:

"The receiver was appointed by the comptroller of the currency, January 14, 1889, and Chetwood commenced his suit July 19, 1890. The receiver was not the officer of any court, but the agent and officer of the United States, as ruled by Mr. Justice Gray, on circuit, in Price v. Abbott, 17 Fed. Rep. 506, and by Mr. Justice Jackson, then circuit judge, in Armstrong v. Trautman, 36 Fed. Rep. 276. * * *

"The receiver acts under the control of the comptroller of the currency and the moneys collected by him are paid over to the comptroller, who disburses them to the creditors of the insolvent bank. Under U. S. Rev. Stat. § 5234, when the receiver deems it desirable to sell or compound bad or doubtful debts, or to sell the real and personal property of the bank, it devolves upon him to procure 'the order of a court of record of competent jurisdiction,' but the funds arising therefrom are disbursed by the comptroller, as in the instance of other collections."

Relative to the same subject, the Circuit Court of Appeals of the Ninth Circuit, holding that a District Court's order approving the sale of a failed national bank's assets, upon a receiver's application, under Section 192, supra, was not even reviewable on appeal by the bank's creditors, in Fifer, et al. v. Williams, 5 Fed. (2d) 286, 288, remarked:

"In the present matter, as in the Chetwood Case, supra, the application was entitled 'In the matter' of the receivership of the insolvent bank. By the application the receiver did not submit himself and the affairs of the bank to the jurisdiction of the court; nor did the presentation of the application operate to make the receiver an officer of the court, or place the assets of the bank under the control of the court 'in the sense in which control is acquired where a receiver is appointed by the court.' In re Chetwood, supra. He belongs to the executive branch of the government, and his custody of assets is not that of the court. Farrell v. Stoddard, (D. C.) 1 F. (2d) 802. The

procedure outlined by the statutes did not contemplate a trial in court. And no case is cited which lends support to the view that the statute intended that an objecting creditor could litigate with the receiver—who represents creditors and the insolvent bank—the question determined by him as to the advisability of disposing of the assets of the insolvent institution. There is no suit; no parties in the legal understanding of the term; no process must issue; no one is authorized to appear on behalf of the receiver or any one else, or to subpoena witnesses. It is an ex parte proceeding, and, though by the will of Congress put under judicial cognizance, is not by its own nature a judicial controversy. The fact that, when the receiver filed his application, the judge sought information and directed that notice be published that the court would hear persons interested in the insolvent bank upon the question of the proposed sale, does not change the administrative character of the proceeding. The course followed was, evidently, out of a cautious wish to gain advice that would be helpful in finally determining whether or not the order applied for by the receiver should be granted.''

In effect, the same conclusion as in the case last cited was reached in the Circuit Court of Appeals for the Fifth Circuit in Jackson, et al. v. McIntosh, Comptroller, et al., 12 Fed. (2d) 676.

While in Massachusetts the courts appear to have been given powers with reference to the acts of the Commissioner of Banks broader in scope than those possessed by the national courts relative to receivers appointed by the Comptroller, yet in Commonwealth v. Allen, 240 Mass. 244, 133 N. E. 625, 626, it was said:

''The Commissioner is an executive or administrative officer. He exercises visitorial powers, is charged with duties of rigid inspection, and, when circumstances exist enumerated in St. 1910, c. 399, § 2 (G. L. c. 167, § 22), may take and retain possession of the property and business of the bank for the purpose of liquidation of its affairs in accordance with the statute. He acts in all these particulars as a public officer, and not as a receiver appointed by the court. While he possesses some powers commonly con-

ferred upon a receiver, and in many respects is subject to the direction of the court, he nevertheless carries out directly and in his own official capacity a legislative policy. His chart is the legislative mandate as declared in the statute. Greenfield Savings Bank v. Commonwealth, 211 Mass. 207, 209, 97 N. E. 927.''

And in Steele v. Randall, 19 Fed. (2d) 40, 42, the Circuit Court of Appeals for the Eighth Circuit used this language:

''Appellant places much reliance upon the fact that its judgment was secured before the receiver was appointed by the comptroller. We think this is unimportant. The inaccurate use of the term 'receiver' in the statute has led appellant to an erroneous conclusion. This statutory 'receiver' is not in any sense such an official as a receiver appointed by a court of equity. He is an administrative officer selected by the Comptroller and is an agent and officer of the United States (United States v. Weitzel, 246 U. S. 533, 541, 38 S. Ct. 381, 62 L. Ed. 872; In re Chetwood, 165 U. S. 445, 458, 17 S. Ct. 385, 41 L. Ed. 782; Bushnell v. Leland, 164 U. S. 684, 17 S. Ct. 209, 41 L. Ed. 598; Kennedy v. Gibson, 8 Wall. 498, 504, 505, 19 L. Ed. 476; Weitzel v. U. S., 274 F. 101 (C. C. A. 6th), certiorari denied 257 U. S. 644, 42 S. Ct. 54, 66 L. Ed. 413), with certain statutory duties in connection with winding up the business of a federal instrumentality.''

Article 7, § 7 of the Banking Act of Georgia, approved August 16, 1919 (Laws 1919, p. 156), is almost identical in phraseology with that portion of our Section 10-512 supra, relied upon by defendants as granting general authority to the State Examiner to act as proposed in his application to the District Court of Albany County, for it reads:

''Upon taking possession of the assets and business of any bank, the superintendent is authorized to collect all moneys due to such bank, and to do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof, as hereinafter pro-

vided. The superintendent shall collect all debts due and claims belonging to such bank, and by making application to the superior court of the county in which such bank is located, or to the judge thereof, if said superior court be not then in session, may procure an order to sell, compromise or compound any bad or doubtful debt or claim, and on like order the superintendent may sell the real and personal property of such bank on such terms as the court, or the judge thereof, shall direct.''

Concerning this statute and the status of the Superintendent of Banks in that state and the courts in their relations with each other under it, where the Superintendent was seeking an order authorizing the sale of an insolvent bank's assets, the Court of Appeals of Georgia, in Cochran, et al. v. Bennett, Superintendent of Banks, 37 Ga. App. 202, 139 S. E. 428, said:

''The judge of the superior court, when passing upon an application of the superintendent of banks for permission to sell the assets of a bank which has been taken over by the superintendent, and in passing an order authorizing a sale of the assets of the bank by the superintendent, as is provided in Article 7, § 7 of the Banking Act, approved August 16, 1919 (Ga. Laws 1919, pp. 135, 156) is not administering the assets of the bank, and passes upon and adjudicates no rights of parties, but is merely, under statutory authority, directing a state officer, who is not an officer or receiver of the court, in the discharge of a statutory duty. This is true notwithstanding that the statute requires that before the passage of such order the bank be made a party to the proceedings by proper notice issued by the court. Such an order of sale is not judicial, but is purely administrative or ministerial, and is therefore not a judgment of a court which can be reviewed by a writ of error.''

And in Bennett, Superintendent of Banks v. Duke, 38 Ga. App. 598, 144 S. E. 686, 687, the same court reiterated the views expressed in the case last cited and further said:

52

"The order of the judge of the superior court directing the superintendent of banks to pay over funds belonging to the assets of the bank, which he as superintendent of banks had taken over for liquidation, to a named person as 'commissioner,' appointed by the court 'to represent the interest of creditors, stockholders, and depositors' of the bank, and providing that in the event the superintendent of banks should fail to pay over the funds as ordered, he show cause why he should not be attached for contempt, was without authority of law."

In New York the statute (Banking Law [Consol. Laws C. 2] 69), provides: "The superintendent is authorized upon taking possession of the property and business of such corporation * * * to liquidate the affairs thereof and to do all acts and to make such expenditures as in his judgment are necessary to conserve its assets and business. * * * He * * * upon such terms as the court shall direct, may sell or otherwise dispose of," the assets in his charge. With these statutory provisions in mind, the court, in Re Union Bank of Brooklyn, 176 App. Div. 477, 163 N. Y. S. 485, 489, said concerning the Superintendent of Banks in that state:

"He is not a part of the judicial branch of the government. He does not take his office nor derive any of his original powers from it. He is of the administrative branch of the government, appointed by the Governor and confirmed by the Senate. Section 10, Banking Law. He is a state officer. Article 1, § 2, Public Officers Law (Consol. Laws. c. 47) ; People ex rel. Baird v. Nixon, 158 N. Y. 221, 52 N. E. 1117. And as such officer he is expressly clothed by the Legislature with this power of liquidation. Section 69, Banking Law. * * * Thus it appears as superintendent he takes possession, holds possession until final liquidation by him, and is authorized to liquidate, outside of any judicial proceedings. The fact that he must receive the sanction of the court before certain steps in his procedure are effective (e. g., Sections 63, 69, 74, 78, 79) does not imply that the liquidation itself is judicial. * * * It is quite true that the courts have

in discussion compared the duties of the superintendent as a liquidator to those of a receiver. Matter of Union Bank, 204 N. Y. 313, 316, 97 N. E. 737; Van Tuyl v. Scharmann, 208 N. Y. 62, 101 N. E. 779. Naturally, for each in winding up a corporation performs the same kind of duties. But the statute does not provide that the superintendent, by virtue of his office or by virtue of these statutory duties cast upon him, shall be a receiver or shall be regarded as such in the eye of the law. This the Legislature might have done as it did do, e. g., by Section 2 of Chapter 3 of the Laws of 1836. And I am not aware that any court has decided that the superintendent, in the exercise of his statutory duties as a liquidator, is but a receiver and subject to any court as a receiver is subject to the court that made him.''

These authorities make it plain, we think, that the District Court has no legal authority to deal with the affairs of an insolvent bank in the hands of the State Examiner unless the statute so directs. The argument for the defendants is, as we understand it, that the general chancery power of the court to control and direct a receiver appointed by it may be here invoked by the State Examiner and the latter thereby transformed, under the circumstances here shown, into an officer of the court and derive his authority to act from that source. But the whole scheme of the law relative to the administration of the assets of insolvent banks, as the citations above given show, repells any such view. Especially is this so when we recall the positive prohibition of Section 10-520, quoted supra, forbidding generally the District Court to appoint a receiver without notice to the State Examiner and vesting the latter with full power to take possession of the insolvent bank and to put a stop to all court receivership proceedings relative to it.

Our attention has been drawn to no statutory provision either in terms or by necessary implication directing the District Court to act upon such an application as is here shown to have been presented by the State Examiner to

the District Court of Albany County. The clauses of Section 10-512 relative to compounding or selling bad or doubtful debts and selling all the real estate and personal property of the insolvent bank certainly cannot be relied on as furnishing such statutory direction nor do we understand any such claim is made. So far as the clause of that section which commands the State Examiner to "collect money due to such bank and do such other acts as are necessary to preserve its assets and business and shall proceed to liquidate the affairs thereof as hereinafter provided" is concerned, we fail to see that it adds anything to the scope of the law. The conservation of the assets and business of the insolvent institution for the benefit of those interested is the underlying purpose of the statute authorizing the State Examiner to administer such property. As said in Van Tuyl v. Scharmann, 208 N. Y. 53, 63, 101 N. E. 779, 782. "The scheme of the statute was to provide a procedure for the liquidation of delinquent corporations through a department of the state for the benefit of creditors, which would be economic and speedy." By necessary implication, it would be the Examiner's official duty to perform all such acts "as are necessary to preserve its assets and business" from the moment he took charge of the failed institution, pursuant to the statute giving him power to do so.

In this connection, it is pertinent to remember that the act of Congress creating the Reconstruction Finance Corporation, itself provides that "any receiver of any national bank is hereby authorized to contract for such loans and to pledge any assets of the bank for securing the same." This specific enabling clause at once suggests the query—why was such a definite grant of authority given to receivers under the Federal system of insolvent bank administration? The national law, like our own as we have seen, requires that such receivers shall apply to the courts for orders of sale and to compound bad or doubtful debts.

A fair answer to the query suggested is that the framers of the Federal law considered either that it was doubtful whether receivers, under the national banking act, possessed such extraordinary power or that they never before had had it. No case has come to our notice where it has ever been intimated that authority of this kind was previously vested in these officials.

This opinion might, perhaps, well be closed at this point, but in aid of all concerned in this litigation we deem it proper to pursue the matter farther. Another phase of this case, as it has been here presented, may not be disregarded. The State Examiner, as it appears, has requested the District Court of Albany County for an order authorizing him to pledge not to exceed $225,000 of the assets of the First State Bank of Laramie, upon such terms and provisions as the Reconstruction Finance Corporation may require of him, in order to obtain a loan from it wherewith to pay a dividend to the bank's creditors. A proposed form of application is submitted to the court which, if accepted by said corporation, will become a binding contract. Some of its significant clauses have been already quoted. Recapitulating briefly, they demand the delivery of the pledged assets (in this case more than one-fourth of all of the assets of the bank), together with an executed obligation on the part of the Bank Examiner to repay the loan at such rate of interest as the obligee may exact, to the Reconstruction Finance Corporation unless otherwise directed by it and to be released only as it sees fit; they demand that the Examiner shall "proceed diligently with the liquidation of the pledged assets" and to secure his faithful accounting to said Corporation, they exact from him a bond in form and amount as it may approve; they require him to pay promptly when due all charges or expenses necessary for the enforcement, preservation or protection of any pledged assets; it is required that, in case the Examiner fails to perform as dictated by

the agreement, the Reconstruction Finance Corporation, upon notice, may collect and at his expense enforce payment of any or all pledged collateral by suit or otherwise and "release, renew, extend or exchange all or any part thereof"; finally, it is required that no dividend or distribution be made from the remaining unpledged assets in the hands of the Bank Examiner until the loan made by the Reconstruction Finance Corporation is repaid and that "such assets of the receivership estate shall be and remain bound for the payment of all indebtedness incurred hereunder."

The effect of all these requirements will be, as we see it, to tie up the entire assets of this insolvent bank, amounting to over $700,000 in face value, until whatever loan the Reconstruction Finance Corporation may grant in return for the pledge of more than one-fourth of such assets is repaid, the Examiner being all the while bound to finance properly the expense necessary to preserve and protect the pledged security and to diligently liquidate the same. Such requirements as these seem to us to produce nothing more nor less than an enforced abdication on the part of the State Bank Examiner of the duties imposed upon him by the laws of this state. Who shall judge whether the Examiner is "diligently" liquidating the pledged assets as he must agree to do? Should he fail to perform any of his covenants, it rests with the Reconstruction Finance Corporation, at his expense, to force payment of all collateral pledged or otherwise dispose of it. He must surrender his possession of the pledged assets—a substantial part of his entire trust estate—to another and submit to its dictation in its management. Have the District Courts of this state jurisdiction to aid a public officer in surrendering to others the duties imposed upon him by law? To ask the question is to answer it in the negative.

In Ex parte Moore, 6 Fed. (2d) 905, 909, it appeared that an order for a proposed sale of assets of an insolvent

national bank applied for by the receiver was objected to by certain creditors of the institution. Refusing to make the order sought, the court said:

"The next objection is that under the proposed plan for the sale of the assets the unacceptable assets are to be collected, not by the receiver under the direction of the Comptroller, as the law requires, but are to be turned over to the purchasing bank for collection in conjunction with certain trustees. The proposed plan virtually amounts, so far as the unacceptable assets are concerned, to an abdication by the receiver of the duties imposed upon him by law. There is no authority of law for him to turn over these unacceptable assets to other persons for collection without retaining any control over their actions. It is to be observed also that under the proposed plan the purchasing bank is to have the power as to the unacceptable assets 'to sell, collect or compound such unacceptable assets without submitting to the court such proposition for the sale or compounding thereof as may be made to it from time to time.' The receiver may not sell or compound without obtaining an order of the court, and yet it is proposed to allow the purchasing bank these wide powers. I think this is in direct conflict with the statute, and cannot be approved."

Again, in Jackson, et al. v. McIntosh, (C. C. A.) 12 Fed. (2d) 676, 677, the receiver of a national bank undertook to transfer all the assets of the bank, with certain reservations, to a corporation which had been organized especially to take them in consideration of the delivery to the receiver of its obligations for the amount due each creditor, payable with interest on or before a fixed period. These obligations were to be secured by the assets transferred, placed in the control of trustees and, by the agreement of the corporation, the proceeds of such assets were to be applied, less liquidating expense, to the payment of said obligations, but without liability of the corporation or its stockholders. Holding that the proposed transaction was not a sale, was entirely illegal and that the lower

court erred in declining to give relief against it, the Court of Appeals for the Fifth Circuit said:

"Under Section 5234 of the United States Revised Statutes (Comp. St. § 9821, 12 U. S. C. A. Sec. 1921), a national bank receiver, 'upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct.' This provision does not authorize a disposition of assets which is not a sale. * * * A court cannot properly approve a violation by a receiver of statutory requirements. By Rev. St. § 5234, the 'receiver, under the direction of the Comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and,' etc.

"The effect of the proposed transaction would be a delegation to the corporation of the receiver's duty and authority to collect what was owing to the bank, and a surrender of assets of the bank by the receiver to the corporation, which was not the buyer of such assets. The receiver was not authorized, with or without a court's approval, so to delegate his duties or powers, or to make such a surrender of assets. We are of opinion that the injunction sought was an appropriate means of preventing an illegal disposition of assets of the bank, and that the court erred in refusing to grant that relief."

Certiorari to the Supreme Court of the United States was thereafter applied for and denied (273 U. S. 697, 698, 47 S. Ct. 93, 94, 71 L. Ed. 846). See also Shadewald v. White, 74 Minn. 208, 77 N. W. 42. It may be readily conceded that the Bank Examiner may properly borrow money in the exercise of his function to "do such other acts as are necessary to preserve" the assets of the insolvent institution in his care where taxes must be paid, liens discharged on property in which the bank held an equity subject thereto or repairs made to prevent injury or destruction of the property. The case of U. S. Bank of St. Louis v. Pritchard, (Mo. App.) 20 S. W. (2d) 939, cited by de-

fendants is illustrative of acts of this character. Such transactions accomplish the purpose for which the State Examiner is entrusted by law with the duty of administering the assets of insolvent institutions. They conserve the estate in his care. The proposed course of conduct on the part of the Examiner in the instant case is in no respects analogous. The money is here sought to be borrowed simply to accelerate the payment of dividends to creditors and for no other end.

We have not overlooked the argument advanced for defendants—although its bearing upon the real issues before us for disposition is not easy to perceive—that by securing this proposed loan, the liquidation of assets of the First State Bank of Laramie may be deferred for a period of years and until more favorable economic conditions prevail and so, upon the collateral which was taken over by the State Examiner and which had been given the bank to secure the loans made by it, there will be realized returns more in accordance with their true value. How this will be so, under the intended contract with the Reconstruction Finance Corporation, is not made at all clear. By the terms of that contract the Examiner agrees "to proceed diligently with the liquidation of the pledged assets." How is it possible for the officer honestly and fairly to fulfill the letter and spirit of this covenant by deferring for a period of years the liquidation of these assets? And if he does not fulfill it, the Reconstruction Finance Corporation may foreclose the pledge. During the entire period of the loan there must be on hand and forthcoming from the Examiner funds to pay interest charges on the loan—these an unknown quantity so far as this record discloses, but doubtless no small sum—and all expenses for the enforcement, preservation, and protection of not only the pledged assets but those still remaining in the hands of the State Examiner as well. Such funds, at this time in an undetermined amount, must be procured

from some source and, for aught that appears, it will be necessary to obtain them by at once proceeding with liquidation. They could not well be borrowed as the entire body of assets is subject to the claim of the Reconstruction Finance Corporation.

Indeed, a short and succinct response to the argument advanced for defendants that only by contracting for the proposed loan can the liquidation of the assets of the bank in the Examiner's hands be deferred, is this: If, under a fair interpretation of our state law, that officer himself has authority to defer the collection of such assets, then it is his duty and a duty not to be delegated to others to exercise that authority. If he has not authority of law to so act, then assuredly he cannot acquire it through the device of dealing with the Reconstruction Finance Corporation.

It has not been pointed out why the State Bank Examiner, as well as the Reconstruction Finance Corporation, could not hold the assets in his care until more favorable conditions prevail, if that should be deemed necessary in a wise administration of the trust. He, as an officer of this state thoroughly conversant with the economic conditions and needs of the people of this commonwealth, is, as we see it, in far better position to exercise a sound discretion in the matter and act so as, in due measure, to recognize those needs and conditions than a foreign corporation officered and directed by those unfamiliar with our affairs.

No statute has been drawn to our notice requiring him to sacrifice the assets of the First State Bank of Laramie immediately or prohibiting his retention of them for quite as long a period of time as that for which he could pledge them to the Reconstruction Finance Corporation. While they remain in his care, although dividends may be somewhat deferred, charges of administration will be cut to the extent of interest on the proposed loan and the ex-

penses which the intended contract places it within the power of the loaning agency to incur—an agency created by another sovereignty and over which neither the Examiner or the courts of this state will possess any supervising control.

We have scrutinized with care all the authorities cited by defendants in support of their contentions but do not find any which deal with statutory enactments such as must control the disposition of this case except, it may be, the decision in Riches v. Hadlock rendered by the Supreme Court of Utah and not yet officially reported, wherein, so far as we are advised, the lower court was held neither authorized nor justified in granting an order such as is now sought by the State Bank Examiner from the District Court of Albany County. In no case which we have seen, have the terms of the arrangement with the Reconstruction Finance Corporation been presented fully and completely as here and the consequences of such an arrangement considered.

It is the duty of this court to take the statutory law as written by our legislators and administer it. We may not read into it powers and provisions concerning public officers which, obviously, the legislature never intended to give them nor relieve them of duties plainly placed upon them. The demurrer to the answer of the defendants should be sustained, and a permanent writ of prohibition be issued herein unless defendants, as they may be advised, file an amended answer within fifteen days from the date hereof. It is so ordered.

KIMBALL, C. J., and BLUME, J., concur.